# DANIEL A. LEONARD

*vs.*

# WILLIAM O. PEIRSON ET AL.

*Deed as Mortgage—Debt Secured—Evidence—Compound
Interest—Receivers' Sale—Covenant.*

On an issue as to whether a conveyance, by the president of
a corporation, of land belonging to him, was to secure only a
debt due by him, or was also to secure sums due the lender by
the corporation, *held* that the evidence showed the latter to have
been the intention of the parties.            pp. 30-36

A decree ascertaining the amount due on a claim is erroneous
if it allows compound interest.            p. 37

A covenant by a corporation, in a conveyance to it, to pay
part of a mortgage on the land conveyed, is not binding on a
purchaser of such land at a sale by a receiver of the corporation.

            p. 37

*Decided June 27th, 1923.*

Appeal from the Circuit Court of Baltimore City (DUFFY,
J.).

Bill by Daniel A. Leonard against William O. Peirson
and the Union Trust Company of Maryland for an injunction
and general relief. From a decree for defendants, plaintiff
appeals. Affirmed.

The cause was argued before BOYD, C. J., BRISCOE,
THOMAS, PATTISON, ADKINS, and OFFUTT, JJ.

*W. Irvine Cross* and *Wm. H. Hudgins,* for the appellant.

*Walter H. Buck* and *J. Morfit Mullen,* for the appellees.

BOYD, C. J., delivered the opinion of the Court.

The appellant, plaintiff below, filed a bill in equity to enjoin the appellees (defendants) from disposing of or conveying all or any of ninety-eight lots of ground conveyed by him and his wife to the defendant Peirson by deed dated the 29th of August, 1917. The bill alleges that the plaintiff borrowed from the Union Trust Company of Maryland, one of the defendants, the sum of $2,500 upon a promissory note signed by himself and wife, and that although the deed upon its face is an absolute conveyance of the entire interest of the plaintiff in said lots, which are worth many times the amount of the note, the deed was intended, both by the Union Trust Company and himself, to be only a security for the repayment of the money so borrowed, and there was no other consideration passing to him from the trust company, or from Peirson, who was agent of said company, being its treasurer. It is further alleged that there was an oral agreement between the company and the plaintiff, made contemporaneously with the execution of the deed, that, upon default of payment of the note, the trust company should sell the property in the most advantageous way and for the greatest price obtainable, in connection with other property adjoining and controlled by it, for development purposes, but that said lots should be sold only in due course of the sale of the whole property of the trust company in that locality, as and when developed.

It is also alleged that the trust company and Peirson had done nothing to develop the property conveyed by the plaintiff or the other property adjoining it and controlled by said company; that although payment of the note was demanded in the year 1918, when plaintiff was unable to pay it, the trust company refused to return the property when offered the amount due in the year 1921. It then charges that Peirson is about to transfer the lots conveyed to him to the trust company, which had agreed to sell and convey the whole thereof at the price of $150 per lot; that such sale is a grossly inadequate price, is in violation of the rights of the plaintiff under the agreement, and, if consummated, will result in irreparable

loss and damage to him. There are prayers for the injunction and for general relief.

The trust company filed an answer admitting the loan and the conveyance, but denying that the deed was given merely for the indebtedness of $2,500, and alleging that it was delivered as security for the entire indebtedness of the plaintiff to the trust company and also for certain debts and obligations of the Amiesite and Stone Company, a Delaware corporation, of which the plaintiff was president; that the entire indebtedness of the plaintiff and the debts and obligations of the Amiesite Company have not been paid to the defendant, and, that company having become insolvent, a receiver was duly appointed to take charge of all its assets, which have been disposed of, and that the defendant has no means of obtaining payment except by a sale of the lots. The answer denies the oral agreement alleged, admits that it has not developed the lots, and avers that Peirson and wife conveyed them to it on May 20th, 1919, and that it has endeavored from time to time, without success, to dispose of the lots, but that it now has under consideration the sale of them at about $150 per lot. It denies that such sale would be in violation of the plaintiff's rights, or would result in irreparable loss and damage to him. It then prays that the court shall take jurisdiction over the said land and fix and determine the meaning and effect of any and all agreements between them in any manner connected with or growing out of the conveyance to Peirson; that all accounts between them be determined and adjusted and appropriate decrees be passed. Peirson filed an answer admitting the conveyance of the lots to him, that he was treasurer and agent of the trust company, and adopting as his own the answer of that company.

The trust company filed a cross-bill against Leonard, and in substance makes the charges set out in its answer and prays the court to take jurisdiction over the land, etc., that an account be stated between the parties and prays for general relief.

Mr. Leonard answered the cross-bill, in which answer he denied that there is in equity and good conscience any indebtedness due by him to the trust company, except that represented by the $2,500 note, which he has always been willing and is still willing to pay upon the performance by said trust company of the conditions upon which it is due and payable.

His answer alleges that in 1917 he was president of the Amiesite and Stone Company, owned stock in it, and the said company had the opportunity to take certain profitable construction contracts, but was not able to finance the same; that the trust company urged him to have said company take said contracts and to allow the trust company to finance them, taking as security an assignment to it of the estimates as they were issued; that he declined to do so because of the risk attending the financing of said contracts, and the trust company "of its own volition agreed that if he would have the said Amiesite and Stone Company take such contracts, it would finance the same on said estimates, and would see to it that he was not called upon to pay any money on said contracts. And this respondent avers that it was not the intention of said Union Trust Company to so finance said contracts, but to fraudulently get the said Leonard into its power"; that when the contracts had been taken, the trust company violated its contract and compelled the said Leonard, on August 17th, 1917, to personally endorse a note for said Amiesite Company for the sum of $5,000.

It is further alleged that said Leonard was fraudulently induced to endorse said note, believing that the trust company would carry out its contract as to the rest of said construction contracts; that it did not carry out its said contract and, on February 24th, 1920, sued said Leonard on said note in the Superior Court of Baltimore City and subsequently, on the removal of the suit to the Baltimore City Court, the case was tried, and the court would not allow respondent to show the agreement under which the note was issued, so judgment was obtained against him, but the Court of Appeals reversed the judgment, ordered it to be stricken out, and sent

the case back for trial. It is further alleged that on February 26th, 1919, the trust company also brought suit upon the $2,500 note and the defendant filed a plea which set forth the agreement under which it was given, but the court refused to allow him to prove said facts, and a judgment was obtained against him, which also was reversed in the Court of Appeals and the case sent back for trial. The answer further alleges that if there is any truth in the claim made by the trust company, it has a perfect and complete remedy at law.

A considerable amount of evidence was taken and a decree was passed determining: (1) that the deed was given as a security in the nature of a mortgage and was intended to secure to the trust company the entire indebtedness of the Amiesite and Stone Company to it except $10,000, and also the entire indebtedness of said Leonard to the trust company; (2) that the Amiesite and Stone Company is indebted to the trust company and now owes it the sum of $73,700.38, which amount, less the sum of said $10,000, leaves the amount of $63,700.38, which is now secured by said lots, and that there is in addition now due and owing personally by Leonard to the trust company the sum of $6,344.63, which is also secured by said lots; (3) that within ten days from the entry of the decree said Leonard shall pay or cause to be paid said two sums, together with interest from the date of the decree; (4) that in default of such payment within ten days from the entry of the decree all equity of redemption be forever barred, and that all said land and premises be sold, free, clear and discharged from all claims of the parties thereto, and also of the mortgage from said Leonard and others to the Safe Deposit and Trust Company of Baltimore, dated August 1, 1911; (5) that Walter H. Buck be and is hereby appointed trustee to make the sale and the usual terms and provisions in decrees are set out. From that decree this appeal is taken.

According to Mr. Leonard's testimony, the Amiesite Company needed $10,000 more, and the trust company agreed to lend it on one hundred lots at Caton Heights, the title to which was held by the Amiesite Company. At the time that

company owed the trust company about $50,000, which it had advanced on some road contracts which the Amiesite Company had as collateral. He had conveyed to the company the hundred lots in March, 1917, and there was a previous mortgage on those lots held by the Safe Deposit and Trust Company of Baltimore, on which there was a balance due of $16,000 plus some interest and taxes—the mortgage also including the ninety-eight lots in controversy. When the hundred lots were conveyed to the Amiesite Company, the understanding was that it was to assume the payment of $10,000 of the mortgage to the Safe Deposit and Trust Company, and Leonard agreed to pay the balance of that mortgage. Later he sold his home place and reduced the mortgage to ten thousand dollars.

The only lien on the ninety-eight lots which he still held and which he conveyed to Peirson was the blanket mortgage to the Safe Deposit and Trust Company which covered them and the hundred lots.

After Leonard had arranged to borrow the $10,000 for his company, which loan was consummated on August 29th, 1917, he arranged to borrow the $2,500 which he claims was the consideration of his lots—that being a separate and individual transaction, according to his claim. He had a personal account with the trust company, had borrowed $6,900 on a second mortgage and was an endorser with Dwight D. Mallory on a note of the Amiesite Company for $15,000 and owed some smaller items amounting to $2,000. The $6,900 note was secured by some real estate which was sold and the note paid off. He also said that the note he and Mr. Mallory had endorsed had been reduced about half and had since been paid, and claims that all his personal indebtedness to the trust company except the $2,500 has been paid. He denies that the lots were security for anything but the $2,500, excepting, of course, it was liable for the $16,000 mortgage which he says has now been paid off, and, as will be seen later, he admitted that all except $10,000 of his personal debt was to be paid before the lots were to be re-conveyed to him. He

claimed that the Amiesite Company had property with which it could have secured the trust company outside of the lots mortgaged for the $10,000.

Mr. Leonard on cross-examination said that he suggested to Mr. Peirson, in arranging for the $10,000, that in case his personal debt to the trust company was not reduced to $10,000, he would not insist on the return of the lots. Edward Pilert, who was connected with the Amiesite Company, testified that he was present when the arrangement was made to borrow the $10,000 for the company, and when the trust company agreed to loan Leonard $2,500. He said that Mr. Grape said to Leonard, "Say right now, whether that $10,000 will answer the purpose" and then Mr. Leonard said there were some personal matters pressing him; that he (Pilert) was rather "peeved" at this because he did not think Leonard ought to inject personal matters into the company's business; that Mr. Grape asked him how much he needed and Leonard said $2,500, and upon being asked what security he could give he said the ninety-eight lots; that he called Leonard to one side and asked him why he wanted to give that many lots for $2,500 security, and Leonard replied that he could pay that back shortly and get his lots back again; that Leonard didn't say a word about the lots being security for any other indebtedness than the $2,500.

Those are the two witnesses who testified for the plaintiff to the effect that it was agreed that the lots should only be security for $2,500, and there was some difference between the two, for, as we have seen above, Mr. Leonard on cross-examination said that he had suggested that he would not ask for a return of the lots if his individual indebtedness to the trust company was not reduced to $10,000. On the other hand, Mr. Buck, who was attorney for the trust company, testified as to a meeting held on the morning of August 24th, 1917, at which there were present, in addition to himself, Messrs. Leonard, Pilert, Grape, a vice-president of the trust company, Peirson, another officer of that company, and also Mr. William P. Lyons, who was attorney for Mr. Leonard.

As will be seen later, it is evident that Mr. Buck was mistaken about Mr. Lyons being present at that meeting on the morning of August 24th, but he was present that afternoon and the next day, when the matter was under consideration. Mr. Buck said that a paper, a copy of which he had, was dictated in the presence of the above parties. In answer to the question, what the terms were which were agreed upon for the loan of the $2,500, in connection with which the deed was given, he replied: "Well, the whole thing must be understood as having gone through as part of one transaction," and added that he was referring to the memorandum, a copy of which he held; that it had five paragraphs. He then said: "No. 1 states there was to be a loan by the Union Trust Company to the company for one year. $10,000, secured by a mortgage on the company's lots at Caton Heights."

That mortgage was then offered in evidence. Mr. Buck further said that it was executed the following Wednesday, August 29th, 1917, was prepared by him, and the acknowledgments taken before his notary—that it was typewritten in his office in the Continental Building.

He then read paragraph 2, which said: "The next one is this deed by Leonard to Peirson of his Caton Heights lots, getting Leonard's note for $2,500, then advanced to him with the understanding afterwards to be put in writing by me that the property was not to be re-conveyed to Leonard until the entire indebtedness of both Leonard and the company to the Union Trust Company, principal and interest, is reduced to $10,000." It is not necessary that the rest of the memorandum be quoted.

Without giving all of the details of his testimony, it is sufficient to say that Mr. Buck was very positive that the lots conveyed to Peirson were to be held as security for all of the indebtedness of the Amiesite Company and Leonard to the trust company. He said it was understood at first that a letter was to be given by him to Mr. Leonard, showing for what the lots were held, but by reason of section 1 of article 66 of the Code, to which Mr. Lyons had called his attention,

he concluded that the letter could not be given in connection with the deed, and afterwards neither Mr. Leonard nor anyone else directly or indirectly asked for it; that he never heard of any claim by Mr. Leonard to these lots until after he brought suit on the $2,500 note.

W. O. Peirson, who was the vice-president of the trust company, testified that he was present at the conference about the two loans of $10,000 and $2,500; that the Amiesite Company then owed the trust company about $55,000, and they had practically nothing as security—that they had some assigned contracts of very questionable value, although they thought they had value when they took them, but there was no equity in them—that is, the difference between what the State paid and the cost of the work, and before the trust company got anything the Amiesite Company had to deduct the cost; that Mr. Leonard had been to see them about some more loans the first of the week and the conference on Friday, August 24th, 1917, was the outcome of their refusal to finance him any further until they had additional security. This appears in his evidence:

"Q. Who was present? A. Mr. Leonard came around in accordance with an engagement, and Mr. Buck was there, and he had his own attorney, Mr. Lyons, and Mr. Pilert was there and Mr. Grape. Q. Tell what took place. A. We had a conference that lasted quite some time, and the stenographer was called in and Mr. Buck dictated that paper. The stenographer took that paper out, the original of this is in the files of the Union Trust Company. This is a carbon copy that was dictated to our stenographer and was brought back and read, brought back and read so that everyone present would know exactly the conditions and terms of that loan. Q. It was read in the presence of Mr. Leonard and his attorney and Mr. Pilert? A. Yes. Q. I hand you this paper marked for identification, and ask you if those were the terms agreed upon? A. Yes, I have read this. It is a duplicate of the original. There were probably a half dozen carbon copies

brought in at that time. We had a round table, and six or seven there and each one got a copy. Q. When did the transaction go through pursuant to these arrangements you made on this particular Friday, August 24? A. I could not say for certain. Sometime the following week. I am not sure as to just the exact date. Q. Were there any changes made in it before it went through? A. No changes whatever. The original paper was drawn as per that agreement."

The evidence on the subject as to what security the lots were conveyed for is very conflicting, as far as we have gone. Messrs. Leonard and Pilert testified on one side and Messrs. Buck and Peirson on the other, and it is impossible to reconcile their statements. Apparently the court asked for the two other witnesses that would seem to be informed on the subject. Mr. William P. Lyons, who was attorney for Mr. Leonard, testified that he was not present at the conference on the morning of Friday, August 24, but was present that afternoon and the next morning. He keeps a diary of his transactions and when asked whether he could tell why the transaction took the form of a deed, he said he could only do so from the memorandum which he made on Saturday the 25th; that he represented Mr. Leonard, but not the company. It seemed to be agreed by both sides, at least was not objected to, that Mr. Lyons should read the memorandum which he made on that Saturday, although he stated he was not altogether certain about it, that it did not refresh his recollection so that he could positively state that that was correct, but he believed it was; he believed it was correct when he made it. He was told to read it and did so. It is as follows: "Met D. A. Leonard at Union Trust Company. Before D. A. Leonard, saw and spoke briefly to Walter H. Buck. After D. A. Leonard came, talked with him and Mr. Grape and Mr. Pierson. The company agreed to lend Aimesite Company $10,000 and get back mortgage from company on 100 lots owned by it, subject to mortgages now on it. For this $10,000 D. A. Leonard to make deed of his lots at Caton Heights and Mr. P— (Peirson, that would be)—he will

re-transfer them on payment of all indebtedness to the Union Trust Company of Amiesite Co. except $10,000. Mr. P. to become treasurer of company until indebtedness liquidated. The Union Trust Company to let Amiesite Company, D. A. Leonard, have out of estimates coming in sufficient with $10,000 to complete contract, and the Company also to advance at once sufficient to meet to-day's payroll."

Morris H. Grape testified that in August, 1917, he was vice-president of the Union Trust Company but was not connected with that company at the time he was testifying. In answer to what his recollection was as to the lots deeded by Leonard to Peirson he said: "My understanding in reference to that transaction was that those lots secured all indebtedness of the Amiesite and Stone Company to the Union Trust Company, and were not to be deeded back until all indebtedness was paid in full."

He said he had never made a statement to Leonard that the deeds for the lots only secured the $2,500. He was shown the memorandum made by Mr. Buck and said, "That entirely agrees with my memory of the transaction." It is admitted that the deed from Leonard to Peirson was intended simply to secure indebtedness, and must be held in equity as a mortgage. The conflict is as to what indebtedness it was to secure. Mr. Leonard's testimony is not altogether in accordance with the allegations of his bill, as the latter alleges that the deed was only intended as security for the $2,500 loan, while on his cross-examination, in answer to a question by the court, he said that he was not to insist upon the return of the lots on the payment of the $2,500 if his personal indebtedness was not reduced to $10,000, and although he claims that that indebtedness had been reduced to less than that amount, there is the variance between the contract alleged in the bill and the one he testified to; but as apparently his personal indebtedness had been thus reduced and the trust company relies on the alleged agreement that the lots were not to be returned unless his indebtedness and certain debts and obligations of the Amiesite Company to the trust company were paid, that

is the real question in the case. Although the evidence of
Mr. Lyons is based on the memorandum he made on Satur-
day, August 25th, 1917, and he was not clear in his recollec-
tion as to how he obtained the facts from which it was made,
as he was attorney for Mr. Leonard at the time, he must then
have been reasonably satisfied as to his understanding of it.
Messrs. Buck, Peirson and Grape contradict Mr. Leonard and
Mr. Pilert. The latter's testimony is not wholly in accord
with that of Mr. Leonard, as shown above.

It is true that in the affidavit of Mr. Peirson to the account
filed by the trust company in the receiver's case there is the
statement, "nor hath he or the said corporation received any
security for the same," but it might well be, so far as these
lots are concerned, that he meant that no security had been
received from the Amiesite Company, as, if Mr. Leonard's
property paid any part of the debt of that company, he would
be entitled to be substituted to that extent, and the debt of the
Amiesite Company would not be reduced by a payment of any
part by his property. The same thing might be said in
explanation of the testimony of Mr. Grape, who swore to the
bill filed by the trust company in order to have the receiver
appointed for the Amiesite Company.

The testimony as to the alleged agreement of Mr. Grape to
finance the contract and to furnish cars for carrying out the
contract which the Amiesite Company entered into does not
establish any such definite agreement as to bind the trust
company and relieve Mr. Leonard of any indebtedness he
owed the trust company. It is not shown how the vice-presi-
dent of the trust company could furnish cars on the railroads,
or, if he could, there is nothing to show that he had power to
bind his company by any such undertaking. In point of fact
it was not even shown that the failure to get cars was the
real cause of the company's failing to carry out the contracts.
Apparently the trust company did finance the Amiesite Com-
pany to a large amount, but we know of no authority which
would authorize the court to hold that a bank or trust com-
pany could be held to finance to an indefinite extent a com-

pany engaged in such contracts, by such statements as are claimed were made by Mr. Grape and Mr. Peirson. Moreover, the claim is positively denied by both of them.

There are some things in the decree which we feel called upon to note. It was passed the 19th of March, 1923, and we are not certain whether the claim of the trust company against the Amiesite Company is credited with the distribution made by the receiver. There is an entry in the record which shows a balance due as of December 15th, 1917, the date the receiver was appointed, of $64,097.07, which is credited with, "less payment 6/1/19, $8,625.03." That may be the distribution, but if it is not, apparently there would be no injurious error, as it is not suggested that the lots of Mr. Leonard were worth anything like the amount of the claim of the trust company. We also had some question about the form of the decree, which, in ascertaining the amount due, seems to include compound interest. The balance claimed to be due ($64,097.07) includes interest up to December 15th, 1917, and then apparently allows interest on that interest, and the decree allows interest from its date. If we are right in our understanding of that, there was error, according to *Mobray* v. *Leckie,* 42 Md. 474, 479, but what we have said above as to the distribution would be applicable. That would not be an injurious error unless the lots conveyed by Mr. Leonard to Mr. Peirson are worth much more than the record indicates.

We do not understand how the covenant by the Amiesite Company in the deed from Leonard and wife to it enters into this transaction. It cannot be that a purchaser of the lots at a receiver's sale would be personally bound by such a covenant from a defaulting company. Mr. Leonard conveyed the hundred lots to the company and he and the company agreed that instead of the company's lots being liable for the whole mortgage on it ($16,000), the company should be liable for $10,000 and Leonard for $6,000. That was an undertaking to determine the liability of the two sets of lots—the company's and Leonard's—for the mortgage. The decree directs the sale of the Leonard lots free of that mortgage, and hence

Leonard has nothing to complain about in reference to that part of the decree. Whether or not the Safe Deposit Company can be affected by the decree may be a different matter, as it is not a party to this proceeding, but if it still has an interest in the mortgage, and if the decree does not affect it, because it is not a party, this Court is certainly not called upon to determine the question in the absence of the mortgagee, the Safe Deposit Company.

To avoid any possible misunderstanding it may be well to add that our understanding of the reference in the decree to the amount due by the Amiesite Company to the trust company is that the lower court did not mean to indicate or imply that Mr. Leonard was personally responsible for that amount but only that the lots were liable for it.

As we cannot hold that there was any reversible error in the decree, it must be affirmed.

*Decree affirmed, appellant to pay the costs.*